Nathaniel T. Helman, J.
The action is brought under article 3-A of the Lien Law by the National Surety Corporation as *580 subrogee of the rights of laborers, materialmen, and suppliers of the Arthur J. Walsh Contracting Co., contractor on a public works construction project in the City of Beacon, against the Fishkill National Bank, to recover trust funds allegedly diverted by the bank. The contract involved the construction of an intercepting sewer at an agreed price of $286,710 (adjusted by reason of additions to $325,884.15). The customary labor and material payment bond, as well as a performance bond, were executed by Walsh as principal and plaintiff as surety. Work under the contract continued until October 7, 1963 when Walsh was declared in default by the City of Beacon.
Prior to the declaration of default, the Surety Company paid the claims of subcontractors, laborers., suppliers and material-men for labor and material used in the performance of said contract, and it presently brings this action as subrogee of the rights and remedies of such claimants;
On August 29, 1962, some three months after the making of the contract, Walsh executed and delivered to the defendant bank an assignment of all moneys due or to become due to Walsh from the city on the sewer contract. It is the claim of the plaintiff that although the defendant filed its assignment with the City of Beacon, no “ Notice of Lending ” under section 73 of the Lien Law was filed, nor did the assignment itself contain either (a) the detailed information required to be set forth in a “ Notice of Lending” under section 73, or (b) the covenant required by subdivision 5 of section 25 of the Lien Law. Under its assignment, the bank received from the city the sum of $194,529.92 in repayment of its several loans to Walsh, and it is the claim of the plaintiff that since these repayments were made out of the contract payments due from the City of Beacon, they were trust funds which were required to be first applied to payments of claims of laborers, materialmen, subcontractors and suppliers, so that the use of such sums by the bank for its own use and benefit constituted a diversion of said trust funds in violation of the Lien Law provision.
The issues between the parties have in some aspects been considered by our courts, but other phases of the controversy between the lending institution and the surety remain somewhat unsettled. Notwithstanding the protests of lending institutions that allocation of the risk of loss has been weighted against the lenders, and in favor of the suppliers and laborers, the trend of legislation has been toward the use of every pressure to assure the payment of the claims of laborers and material-men for their contributions to the work. All other considera *581 tions have been subordinated to that single purpose. Thus, subdivision 3 of section 70 provides that every trust under article 3-A ‘ ‘ shall commence' at the time when any asset thereof comes into existence, whether or not there shall be at that time any beneficiary of the trust.” (Emphasis added.) Further provision is made that the trust shall continue until every trust claim arising at any time prior to completion has been paid.
Since every public improvement contract is bonded, the surety succeeds to the right of his principal, under well-established legal doctrines, from the date of the execution of the bond. (Scarsdale Nat. Bank & Trust Co. v. United States Fid. & Guar. Co., 264 N. Y. 159; United States Fid. & Guar. Co. v. Triborough Bridge Auth., 297 N. Y. 31, 35, 36; Lien Law, § 77.) In addition to its common-law rights of exoneration and indemnification, the surety has been authorized by section 77 of the Lien Law, upon effecting its payment to an obligee or beneficiary, to turn toward an alleged diverter to seek recovery for the diversion of moneys appropriated for the particular improvement, and is thus enabled to prosecute a trust fund action as if it were itself one of the stated beneficiaries. (Metropolitan Sand & Gravel Corp. v. Lipson, 4 Misc 2d 216, 7 A D 2d 916; Glens Falls Ins. Co. v. Schwab Bros. Trucking, 53 Misc 2d 230, affd. 27 A D 2d 802, mot. for lv. to app. den. 19 N Y 2d 940.) Upon completion of the contract, it is entitled to be reimbursed for the expense thereof, not only from the “ unearned monies ” of the contract, but from the “ retained percentages ” as well. (Arrow Iron Works v. Greene, 260 N. Y. 330; Awad v. Universal Coconut Corp., 37 Misc 2d 208.)
It is the position of the defendant that the filing of its assignment from Walsh of “ all monies due or to become due ” under the sewer contract, was in full compliance with section 16 of the Lien Law and therefore defendant was not guilty of a trust fund diversion. The latter .section provides in part for a recording within 20 days after execution of the assignment and a filing of same with the head of department having charge of construction as well as the financial officer charged with the disbursement of funds applicable to the contract. Additionally, a provision of subdivision 5 of section 25 states: “ Every assignment of moneys, or any part thereof, due or to become due under a contract for a public improvement shall contain a covenant by the assignor that he will receive any moneys advanced thereunder by the assignee and will hold the right to receive such moneys as a trust fund to be first applied to the payment of trust claims as defined in section seventy-one of the lien law, *582 and that he will apply the same to such payments only, before using any part of the moneys for any other purpose.” (Emphasis supplied.)
In the year of 1958, representatives of materialmen and of surety companies presented their objections to a bill recommended by the Law Revision Commission, involving lenders, contending that the proposed legislation failed to emphasize the importance to the public of notice of any transaction by the owner or contractor that might lead to depletion of funds available for future trust claims. It was urged that persons who furnish materials and services in reliance on the trust assets are entitled to notice that those assets have been anticipated for current expense. The outgrowth of these discussions was the creation of the “ Notice of Lending ” in section 73 of article 3-A. That article first became effective in 1942 to provide a civil remedy for the enforcement of a trust described in the article, but the later amendment of 1959 inserted a significant provision generally to the effect that an assignment could be set aside as a diversion under article 3-A. The significant language of the new amendment was: “ Parties having assignments of moneys due or to become due under a contract for the improvement of real property, unless such assignments be set aside as diversions of trust assets as provided in article three-A of this chapter, shall have priority as follows : * * * ” (Lien Law, § 13, subd. 1-a; emphasis supplied.)
By the new amendment, filing of “ Notice of Lending ” in the form specified in the statute would provide the lender with an affirmative defense in any action brought against a transferee of trust assets to set aside the transfer or to recover for a diversion.
In .response to the charge of this plaintiff that no formal “ Notice of Lending ” was filed by the bank, under the recent statute, and that the appropriation of the contract moneys to its own use represented a diversion as against the claim of the surety for expenditures made to labor and materialmen, defendant’s position is that compliance with section 16 in the filing of its assignment, was sufficient to meet the requirements of the statute notwithstanding the new provisions of article 3-A ( § 73). Principal reliance is placed by the bank on the case of Trinca & Assoc. v. Tilden Constr. Corp. (44 Misc 2d 1094, affd. 24 A D 2d 704, mot. for lv. to app. den. 16 N Y 2d 485). That case, however, can only be considered in the light of the subsequent decision of the Court of Appeals in Caristo Constr. Corp. v. Diners Fin. Corp. (21 N Y 2d 507) which analyzed and in part distinguished its prior holding in the Trinca case.
*583 There the contractor executed an all-moneys assignment of his contract with the Board of Education so that moneys payable under the contract were paid to the lender, who agreed to make available to the contractor, out of moneys received, the funds for payment to subcontractors. That the factor did not file a “ Notice of Lending ” was held not to have been a diversion, because the assignment was made with the express purpose of issuing payments to trust beneficiaries and the factor was merely a medium through whom such payments were effected to the trust beneficiaries in the full amount of all trust funds. The court therefore held that an assignment under section 16, duly recorded, served the purpose of a “ Notice of Lending ” and would not be nullified merely because it was not so designated. The Court of Appeals distinguished the Trinca case in the following language (p. 514): “ The factor argues that Trinca & Assoc. v. Tilden Constr. Corp. * * * is directly in point. It is, in part; but two circumstances serve to distinguish the case. First, the assignments to the factor there had been properly filed, and this was held to give adequate notice to lienors. Second, the factor made the payments directly to the trust beneficiaries, thus effectuating the trust purpose. Significantly, the factor in the Trinca case made all of its checks payable to the lienors and not to the borrower.” (Emphasis ours.)
The challenge to the validity of the assignment in the case at bar is founded upon the following allegations:
1. There was no filing of the assignment with the two officials referred to in section 16, namely the head of the department or bureau having charge of construction and the financial officer of the public corporation involved. (It appears that the assignment was filed only with the financial officer of the City of Beacon, to wit, the Commissioner of Public Works.)
2. The assignment did not contain the covenant required under section 25 of the Lien Law. (While the “ Whereas Clause ” of the assignment contains a statement to the effect that the understanding between the parties was that Walsh would apply the funds to labor and material claims, such a nonobligatory declaration hardly constitutes the form of covenant required under the statute.)
3. The assignment did not conform to the requirements of subdivision 3 of section 73 of article 3-A of the Lien Law in that it did not state the date of *1 any advance made on or before the date of filing ” nor “ the maximum amount of advances made and to be made pursuant to the notice,” (The fact that a series of loans was made over an extended period without separate *584 filings of ‘ ‘ second notices of lending and third notices of lending ”, as required by the statute, can hardly suffice to apprise subcontractors and interested persons of the extent of the security pledged. Nor does the bank meet this challenge by pleading that such a filing might be a “falsification”, since factually accurate notices could easily have been filed.)
While the cited cases evince a permissiveness with respect to the filing of either an assignment or a “ Notice of Lending, ” so long as full compliance with the spirit and intent of subdivision 3 of section 73 is accomplished, it is clear that the omission of some of the more formal requirements may touch very.deeply upon substantial rights of interested parties. As Justice BSbbitbl stated in the Caristo case (21 N Y 2d 507, at p. 514): “Involved are not merely formal elements conceived in some legal metaphysic, but practical commercial realities. ‘ Notice of Lending ’ permits creditors of the subcontractor to learn that their debtor’s finances are tightly extended and, specifically, that its accounts receivable are assigned. Under such circumstances further credit would be granted charily and greater promptness of payment required.”
It was the clear intent of the Legislature in 1959 to re-emphasize that lenders must recognize the subordination of their claims to those persons who had acquired the status of trust beneficiaries. The new “ Notice of Lending ”, if properly filed, simply entitled a lender to show by way of defense that such advances were actually applied for a purpose of the trust as stated in subdivision 1 or subdivision 2 of section 71. It was only then that a bank as transferee would be entitled to a credit “ for the amount of the advances with respect to which it is so established (§ 73, subd. 1).” At bar the defendant offered no proof as to what was done by Walsh with the moneys advanced by the defendant under the assignment, although its memorandum to the court indicated it would do so. When a bank receives funds pursuant to an assignment of the proceeds of a contract for a public improvement, it acquires immediate knowledge that it is receiving trust funds under the statute. The law has stated expressly the purposes for which the trust funds are to be first applied and the repayment to the bank of its loan is certainly not one of those purposes. Thus, in the Caristo case, the factor was held guilty of a diversion when it received the entrusted payments from a subcontractor, and again when it gave its checks for advances for the entrusted payment. ‘1 It thus received payments intended for trust beneficiaries and in effect applied them to its outstanding earlier loan.”
*585 Much emphasis is placed by the bank on its lack of actual notice of any misuse of the funds by the contractor. The examination before trial of its representative discloses not only a lack of knowledge of any possible diversion, but an almost painstaking effort to avoid extensive investigation and scrutiny. Prior to the 1959 amendments several decisions tended to relieve lending institutions of responsibility when no evidence of actual knowledge of diversion appeared. For example, Raymond Concrete Pile Co. v. Federation Bank & Trust Co. (288 N. Y. 452) held that actual knowledge of the failure to pay laborers and materialmen was required. The later case of Aquilino v. United States (10 N Y 2d 271, 276), however, pointedly noted that the Raymo'nd case ‘ ‘ must be limited to sections 25-a and 36-a as they read before 1942.” Significant also is the distinction made in the case of Utica Sheet Metal Corp. v. J. E. Schecter Corp. (25 A D 2d 928) where the court said: “ Although a depository in such case, having knowledge of the existence of the trust, is not liable for misappropriations generally, without knowledge, in addition, of the violation of the trust (Bischoff v. Yorkville Bank, 218 N. Y. 106), the issue is at least an open one when the depository transfers the fund to itself (see Aquilino v. United States, 10 N Y 2d 271, 279).” In view of the developing tendency to cast the risk of loss on the lender, where trust beneficiaries have not been paid, a distinction must certainly be drawn between those cases where a diversion is claimed from a misuse of funds by a trustee (owner or contractor) with knowledge of the lender, and those cases where the lender itself is a transferee.
The Law Revision Commission in its report, preceding the 1959 enactment, pointed to the fact that existing practices permitted the owner or contractor to divert assets of the trust to payment of claims arising in another operation or merely to dissipate them. “ These are the very evils the trust fund provisions were designed to overcome.” The commission said further that the new rules were ‘ ‘ calculated to encourage inquiry by the lender as to the state of the trustee’s accounts and a degree of supervision of the application of advances made ” (1959 Report of N. Y. Law Rev. Comm., pp. 215, 216-217; N. Y. Legis. Doc., 1959, No. 65F, pp. 31, 32-33). It seems to me that it was within the contemplation of the draftsmen of the statute that a bank receiving payments directly from the city under a public improvement contract would be presumed to know (1) that the moneys paid to it were trust funds for the payment of labor and materials used under the contract; (2) that the deposit of such funds to its credit in repayment of loans without further inquiry might amount to a diversion; (3) that its failure to *586 formally comply in detail with the “Notice of Lending ” requirements in its assignment might subject the latter to attack and (4) that it was not unreasonable to require some investigation as to whether the contractor had met his obligations to materialmen and laborers before applying the money to its own use and benefit. The question of actual notice may be significant where the bank is charged with diversion by aiding and participating in the use by the trustee of funds for its own benefit or the benefit of a third party, but not where the bank itself is charged with receiving diverted trust funds for its own use.
The bank having failed to file an assignment or “ Notice of Lending ” in the manner required by the statute, the assignment is invalid as against the surety, and the plaintiff is entitled to a judgment that the bank’s application of the funds to its own use constituted a diversion under the afore-mentioned statutes. Such funds as the plaintiff received from the city on account of the contract, amounting to $114,217.65, were properly applied by it to its costs of completion (Arrow Iron Works v. Greene, 260 N. Y. 330). It has been stipulated by the parties that plaintiff, as surety, paid subcontractors, laborers, suppliers and materialmen the sum of $83,074.08. In addition, plaintiff paid Walsh’s labor payrolls for the weeks ending July 10, 1963 through October 9,1963, in the sum of $25,005.92. The court has1 disallowed the item of $9,533.35 for union benefits, since the latter expenditures were not made exclusively for the contract here involved. In view of the determination of the court, the counterclaim of the defendant with relation to alleged improper indorsements by the plaintiff of various checks received from the City of Beacon, must be dismissed as academic.